IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

DANIEL CARVER,                    )
                                  )
       Plaintiff,                 )
                                  )
vs.                               )   Case No. 16-cv-546-JPG-CJP
                                  )
NANCY A. BERRYHILL,               )
Acting Commissioner of Social Security, )
                                  )
       Defendant.[1]              )

## MEMORANDUM and ORDER

In accordance with 42 U.S.C. § 405(g), plaintiff Daniel Carver, represented by counsel, seeks judicial review of the final agency decision denying his application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) pursuant to 42 U.S.C. § 423.

## Procedural History

Plaintiff filed for DIB and SSI on July 26, 2012, alleging an onset date of July 6, 2012. These claims were initially denied on November 8, 2012, and again upon reconsideration on September 27, 2013. (Tr. 10.)

Administrative Law Judge (ALJ) Kevin R. Martin conducted a hearing on December 2, 2014, and issued an opinion denying plaintiff's claims on January 20, 2015. (Tr. 10-20.) Plaintiff exhausted his administrative remedies and filed a timely appeal with this Court. (Tr. 1.)

## Issues Raised by Plaintiff

Plaintiff contends the ALJ improperly "cherry-picked" from the opinions of the state agency psychologists by accepting portions of the opinions that supported his ultimate conclusion and ignoring those that did not. More specifically, plaintiff argues the ALJ erred by

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. *See* https://www.ssa.gov/agency/commissioner.html (visited Feb. 7, 2017). She is automatically substituted as defendant in this case. *See* Fed. R. Civ. P. 25(d); 42 U.S.C. § 405(g).

failing to address plaintiff's limitations in attention and concentration, and his ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances.

## Applicable Legal Standards

To qualify for DIB and SSI, a claimant must be disabled within the meaning of the applicable statutes.[2] For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. § 423(d)(3). "Substantial gainful activity" is work activity that involves doing significant physical or mental activities and that is done for pay or profit. 20 C.F.R. § 404.1572.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation

---

[2] The statutes and regulations pertaining to DIB are found at 42 U.S.C. § 423 *et seq.*, and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c *et seq.*, and 20 C.F.R. pt. 416. As is relevant to this case, the DIB and SSI statutes are identical. Furthermore, 20 C.F.R. § 416.925, detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

continues. The fourth step assesses an applicant's residual functional capacity ("RFC") and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Craft v. Astrue*, 539 F.3d 668, 674 (7th Cir. 2008); *accord Weatherbee v. Astrue*, 649 F.3d 565, 568-69 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. 20 C.F.R. § 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-13 (7th Cir. 2009); *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992).

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three. If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job. *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984); *see also Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. . . . If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to recognize that

3

the scope of review is limited.  "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."  42 U.S.C. § 405(g).  Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made.  *See Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)).  This Court uses the Supreme Court's definition of substantial evidence, *i.e.*, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ.  *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997); *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014).  However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner.  *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

### **The Decision of the ALJ**

In an opinion dated January 20, 2015, ALJ Martin followed the five-step analytical framework set forth above.  He determined that plaintiff met the insured status requirements through March 31, 2017, and had not engaged in substantial gainful activity since July 6, 2012. (Tr. 12.)

ALJ Martin also found that plaintiff had severe impairments of degenerative disc disease of the lumbar spine, seizure disorder, hypertension, obesity, bipolar disorder, generalized anxiety disorder, personality disorder, alcohol abuse, and vocal tic disorder.  (Tr. 12.)

The ALJ further determined that plaintiff had the RFC to perform light work, except that

he could never climb ladders, ropes, and scaffolds and could occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs. Plaintiff should also avoid concentrated exposure to hazards such as unprotected heights. ALJ Martin found that plaintiff could understand, remember, and carry out short, simple instructions for simple tasks. He could also tolerate occasional interaction with coworkers and supervisors in a work setting that did not require interaction with the general public. Plaintiff could respond appropriately to changes in work settings. (Tr. 14.)

Finally, ALJ Martin held that while plaintiff was unable to perform any past relevant work, jobs existed in the national economy that he could perform. Therefore, plaintiff was not disabled. (Tr. 19-20.)

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff.

**1. Agency Forms**

Plaintiff completed his initial disability report in August 2012. He stated he experienced anxiety, depression, high blood pressure, allergies, seizures, panic attacks, Tourette's syndrome, and headaches. He was prescribed atenolol for high blood pressure and Xanax for his anxiety, depression, and seizures. (Tr. 204.)

Plaintiff alleged his conditions negatively affected his memory, concentration, motivation, and his ability to function around others. He sometimes did not know whether he was awake or dreaming and never slept more than three hours at a time. (Tr. 223-24.)

Plaintiff was able to prepare frozen dinners, mow his lawn, and clean. He could not do

laundry and needed reminders to take his medication and to go to the doctor. He tried to go outside every day and grocery shopped once a week. His hobbies included watching television and riding his bike, although he could not tolerate extreme heat. Plaintiff also played horseshoes twice a week. He could walk for approximately a half a mile before he needed to stop and rest. Plaintiff did not drive because he lost his license five years before. (Tr. 225-27.)

Plaintiff could not follow written instructions very well. He also had difficulty remembering spoken instructions if it was "too much." He could not handle stress and feared something would happen to him every day. (Tr. 228-29.)

Plaintiff completed the twelfth grade. He previously worked as a cashier and stocker at a dollar store, as a cook in a restaurant, and as a laborer. (Tr. 205.)

In a subsequent report from February 2013, plaintiff stated he repeatedly tried to work, but his anxiety disorder prevented him from maintaining employment. He experienced memory loss that made him misspell words and forget his children's birthdays. He could no longer afford his psychologist appointments and feared his condition was fatal. (Tr. 238.)

Plaintiff's anxiety also prevented him from completing household chores. He had problems following instructions, paperwork caused panic attacks, and working always resulted in panic attacks or seizures. On an average day, plaintiff would wake up and take his medication, watch television, attempt to do dishes, and take care of his two cats. He could only sleep for two hours at a time and had nightmares. He wore the same clothes for several days, could only bathe once per week, and ate microwave dinners. He needed reminders to shower and take medications. Plaintiff's hobbies included watching television and fishing. (Tr. 244-47.)

Plaintiff had difficulty talking to other people, and his poor memory affected his concentration, understanding, and ability to complete tasks. He could walk for two blocks before

6

he needed a fifteen-minute rest. He could pay attention for five minutes at a time. Plaintiff could not handle stress or tolerate change very well. (Tr. 249-50.)

Plaintiff also began taking Elavil for his nightmares. He described his quality of life as "sad" and he felt "worthless." (Tr. 251.)

Plaintiff's mother also completed a function report, which was consistent with plaintiff's allegations regarding his conditions and functional abilities. (Tr. 257-64.)

2. **Evidentiary Hearing**

ALJ Martin conducted an evidentiary hearing on December 2, 2014. (Tr. 26-57.) Plaintiff, represented by counsel, testified he lived with his parents and had four minor children. He could not remember his children's ages. Along with several physical problems, plaintiff's Tourette's syndrome and anxiety prevented him from maintaining employment. Plaintiff had Tourette's since he was a child, which embarrassed him. He treated with Benzedrine, which helped "a little bit." He also had severe anxiety for eight years, which made him feel like he was going to die and caused seizures. Plaintiff had his first seizure four years before, and they occurred about once a month. He was prescribed Klonopin for his anxiety, and the hospital gave him Dilaudid injections for seizures. Plaintiff was previously prescribed Depakote, but his new psychiatrist would no longer prescribe it. Plaintiff feared that he would die if he left his house. (Tr. 41-44.)

On a typical day, plaintiff woke up, took his medications, and lay back down until around noon. He then paced back and forth in the house and would try to watch television. Sometimes he just sat and stared at the blank television in fear. He could go to the store for a half an hour before having anxiety. He did not travel. Plaintiff's friends visited him about twice per week. (Tr. 45-48.)

7

Plaintiff occasionally drank alcohol. He did not use illegal drugs, although he tested positive for marijuana earlier in the year. He got a DUI six years before. (Tr. 49-50.)

Plaintiff never left the house alone. He believed he was going to fall over unconscious, which actually happened before due to a seizure. Those episodes caused dizziness and then thirty seconds later he would become unconscious. (Tr. 51.)

Plaintiff received psychiatric care from Human Service Center and had a caseworker as well. He thought about his medications all day. If his parents were not home, he curled up on the couch. He could make microwave dinners for himself. (Tr. 51-52.)

A vocational expert ("VE"), Tom Upton, then testified that an individual with plaintiff's age, education, work background, and an RFC consistent with the ALJ's ultimate finding would be unable to perform plaintiff's previous jobs. However, jobs existed that plaintiff could perform, such as a housekeeper, an inspector and packer, and a laundry sorter. (Tr. 52-55.)

If the same individual also had to miss a few days of work per month on an ongoing basis, there would be no jobs available that he could perform. (Tr. 56.)

### 3. Medical Records

Plaintiff received medical attention throughout the relevant period for various physical issues with his back, chest, abdomen, arm, leg, and left hand. His anxiety and history of chronic alcoholism, insomnia, and Tourette's syndrome were noted throughout treatment. (Tr. 323-70, 492, 508, 496, 528, 570-99). Plaintiff also presented to the emergency room for panic attacks and seizures. (Tr. 437-38, 429-20.) His diagnoses on those occasions included anxiety, alcohol abuse, and alcohol intoxication. (Tr. 431, 420.)

Plaintiff received psychiatric treatment from Human Service Center from September 2011 to September 2014. Plaintiff was initially assessed with generalized anxiety disorder,

dependent personality, hypertension, and a Global Assessment of Functioning ("GAF") score of sixty. (Tr. 387.) Throughout the course of his treatment, plaintiff reported feeling anxious, having difficulty sleeping, experiencing seizures, and feeling sick to his stomach if he left his home. He denied depressive symptoms. Plaintiff's treatment included supportive therapy, counselling with a therapist, Elavil, Hydroxyzine, Klonopin, Seroquel, Cogentin, and Xanax. (Tr. 384-88, 399-402, 454-57, 471-73, 602-11.) Plaintiff was later assessed with bipolar disorder, alcohol abuse, hypertension, vocal tic, and borderline personality disorder. (Tr. 456-57, 602.)

On March 13, 2013, plaintiff presented to Dr. Amar Sawar after experiencing two seizures within two hours the month before. Plaintiff's complaints included memory impairment, light-headedness, fatigue, excessive daytime sleepiness, insomnia, depression, anxiety, and panic attacks. Dr. Sawar assessed plaintiff with tonic clonic seizures most likely induced by alcohol, panic disorder, depression, and anxiety disorder. (Tr. 410-12.)

On October 4, 2013 plaintiff presented to Dr. Cameron at Murphysboro Health Center for his anxiety and a medication refill. Plaintiff stated that his other doctor refused to refill his prescription for Xanax. Dr. Cameron prescribed Xanax because "his anxiety over the issue [was] so high that he [would] without a doubt go to ER when runs out of Xanax." (Tr. 465.)

  **4. Dr. Klug's Psychologist Consultation.**

Dr. Fred Klug conducted a psychological consultation of plaintiff on October 17, 2012. Plaintiff stated that he was unable to work because of his anxiety attacks and that his sleep was "poor."

Dr. Klug assessed plaintiff with anxiety disorder, hypertension, and seizure disorder. Plaintiff denied substance abuse. His attentional span was adequate and his concentration was

9

good. His immediate memory was impaired and his short-term memory was marginal. His new learning ability was good and his long-term memory was intact. Plaintiff's fund of knowledge was very restricted and not commensurate with his education, and his reasoning and his ability to perform simple calculations was good. His abstract thinking, insight, and judgment were poor. Plaintiff's intellectual functioning appeared to be low average. Simple tests for central nervous system deficits were negative for brain impairment and his expressive language was good with adequate volume and rate. His receptive language appeared unimpaired and his word fluency was adequate. Plaintiff cleared his throat three times, which, according to Dr. Klug, may or may not have been a vocal tic. Hallucinations were not evident, and plaintiff's thought processes were goal-directed and relevant. His production was concrete and he frequently worried. Plaintiff's affect was constricted and consistent with his thought content. His predominant mood was dysphoric and tense. (Tr. 458-62.)

### 5. Human Service Center Assessment

Human Service Center completed an assessment of plaintiff on March 10, 2014. (Tr. 475-86.) Plaintiff reported severe anxiety, Tourette's syndrome, and seizures. He also stated he became depressed when he did not keep busy. He experienced at least two minor panic attacks every day, which lasted fifteen minutes each. He last had a seizure in August 2013. He denied alcohol or drug abuse. (Tr. 475.)

Plaintiff was prescribed Seroquel for sleeping problems, Benzerapine for Tourette's syndrome, and Klonopin for anxiety and seizures. His current diagnosis was generalized anxiety disorder. Plaintiff claimed he was unable to work because of anxiety. He enjoyed fishing, riding his dirt bike, watching television, and playing pool with his friends. Plaintiff also helped his friend and his mother clean their homes. Plaintiff was financially unable to live on his own. (Tr.

476-80.)

Plaintiff's appearance, posture, physical structure, thought process, and perceptions were appropriate, and his facial expressions were listed as relaxed and anxious. He had a cooperative attitude, and his mood was marked as appropriate, anxious, worried, and sad. Plaintiff's thought content was reality based, his speech and motor activity were normal, and he denied delusions. His memory and eye contact were appropriate, his fund of information was good, and his attention was focused. Plaintiff's insight/judgment and impulse control were good/fair and he was oriented to place, time, person, and situation. Plaintiff's motivation was fair and he was mildly interested in treatment. He was willing to participate in treatment, and his ability was marked as "Able/Adequate Functioning." (Tr. 480-82.)

Plaintiff reported feeling restless every night, tired, and irritated. He found it hard to concentrate on one thing and experienced excessive anxiety or worry more days than not for at least six months. He found it difficult to control his worry and was afraid to be alone. He reported feeling anxious in big crowds. He stated he was unable to work. Plaintiff felt worthless and had excessive guilt. He was afraid of dying and reported crying spells. Plaintiff stated he had a good time when visiting with friends but that he felt depressed. He also experienced weight gain and a loss of pleasure. (Tr. 483.)

Plaintiff was assessed with depression, anxiety, Tourette's disorder, seizures, and a GAF score of fifty. The clinician recommended individual therapy, psychotropic medication, and training to stabilize plaintiff's symptoms. The clinician also recommended that case management services collaborate with other professionals to assist plaintiff in accessing resources and building skills for better housing, work, and self-reliance. (Tr. 484.)

**6.     State-Agency Consultant Mental Residual Functional Capacity Opinions**

Dr. Tin completed a mental residual functional capacity assessment (MRFCA) of plaintiff on October 30, 2012. (Tr. 64-66.) The first part of this form consists of a list of mental activities and instructs: "The questions below help determine the individual's ability to perform sustained work activities. However, the actual mental residual functional capacity assessment is recorded in the narrative discussion(s) in the explanation text boxes." (Tr. 64.)

Dr. Tin indicated under the first section that that plaintiff was moderately limited in his ability to understand and remember detailed instruction; carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; work in coordination with or in proximity to others without being distracted by them; make simple work-related decisions; interact appropriately with the general public; and set realistic goals or make plans independently of others. (Tr. 64-65.)

Dr. Tin explained in the narrative portion of the form, labeled "MRFC-Additional Explanation," that plaintiff was fully oriented and free of thought disorder and serious memory problems. He could remember locations and work-like procedures and could understand and remember short, simple instructions. He had difficulty remembering detailed instructions and maintaining attention and concentration for extended periods. However, plaintiff was capable of performing simple tasks. (Tr. 66.)

Plaintiff claimed he had "a short attention span of about minutes," could not complete tasks, and had problems following spoken and written instructions. Plaintiff could not handle stress well. He had no problems performing activities of daily living or household tasks, but reported a lack of motivation and drive. (Tr. 66.)

12

Plaintiff had difficulty interacting appropriately with the general public, and plaintiff alleged he quit his job because a co-worker caused him to have a panic attack. Dr. Tin opined that plaintiff should be limited to work tasks that do not require interaction with the general public. Plaintiff had the ability to respond appropriately to changes in work settings, be aware of normal hazards, and travel in unfamiliar settings. (Tr. 66.)

Dr. Tin found plaintiff partially credible because his allegations of disability were inconsistent with the activities of daily living and the most recent "PCE." Additionally, Dr. Tin noted that plaintiff's allegation of Tourette's syndrome was assessed only as a rule out diagnosis. (Tr. 66.)

On September 25, 2013, Dr. DiFonso also completed an MRFCA of plaintiff. She concluded that plaintiff was moderately limited in his ability to understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; interact appropriately with the general public; and accept instructions and respond appropriately to criticism from supervisors. (Tr. 91-92.)

In the narrative portion of the form, Dr. DiFonso stated that plaintiff had generalized anxiety disorder, bipolar disorder, and mixed personality disorder with borderline and dependent features. Plaintiff described himself as socially avoidant and Dr. DiFonso recommended moderate limitations of social expectations. Plaintiff's adaptive skills were within normal limits. (Tr. 92-93.)

### Analysis

Plaintiff asserts that the ALJ erred in failing to adequately consider all of the limitations found by Dr. DiFonso and Dr. Tin (hereinafter "the state-agency consultants"). Specifically, he

13

argues the ALJ ignored the opinions that he was moderately limited in attention and concentration, and ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances.

The ALJ discussed the state-agency consultants' opinions at Tr. 17 and essentially repeated the narrative remarks under the "Additional Explanation" section of the MRFCA form. There was no mention, however, that the consultants found plaintiff was moderately limited in attention and concentration and in "ability to perform activities within a schedule, maintain regular attendance, or be punctual within customary tolerances." These limitations were similarly omitted from the ALJ's RFC assessment and from the hypotheticals posed to the VE at the hearing.

"State agency medical and psychological consultants are highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the Act." SSR 96-6p, 1996 WL 374180, at *2 (July 2, 1996). The ALJ is required by 20 C.F.R. §§ 404.1527(f) and 416.927(f) to consider a state agency consultant's findings of fact about the nature and severity of the claimant's impairment as opinions of non-examining physicians; while the ALJ is not bound by the opinion, he may not ignore it either, but must consider it and explain the weight given to the opinion in his decision. *See McKinzey v. Astrue*, 641 F.3d 884, 891 (7th Cir. 2011).

Here, the ALJ assigned "significant weight" to the state-agency consultant opinions and did not state that he rejected any part of those opinions. The Commissioner argues that the ALJ was not required to expressly address the moderate limitations from Section I of the MRFCA form because the ALJ was entitled to ignore these observations in favor of the "narrative RFC" set out in the last section of the form.

14

The Seventh Circuit Court of Appeals has stated that the observations in Section I are medical evidence that cannot be ignored. *Varga v. Colvin*, 794 F.3d 809, 816 (7th Cir. 2015). An ALJ can rely on the narrative portion only where it "adequately encapsulates and translates" the worksheet observations. *Id.* at 816.

Here, the Commissioner points out that the consultants, in their narrative portions, opined that plaintiff could remember locations or work-like procedures and understand and remember short, simple instructions; could perform simple tasks; should be precluded from interaction with the public; could respond appropriately to changes in work setting; could be aware of normal hazards and travel in unfamiliar settings; could perform simple one to two step tasks but had moderate limitations handling detailed tasks; should have moderate limitations in social expectations; and had normal adaptive skills.

The consultants, however, made no reference to plaintiff's limitations in attention and concentration and in his "ability to perform activities within a schedule, maintain regular attendance, or be punctual within customary tolerances." Moreover, the Seventh Circuit has "repeatedly rejected the notion that a hypothetical . . . confining the claimant to simple, routine tasks and limited interactions with others adequately captures temperamental deficiencies and limitations in concentration, persistence, and pace." *Yurt v. Colvin*, 758 F.3d 850, 858-59 (7th Cir. 2014). Thus, under binding precedent, the moderate limitations could not be simply ignored, and this Court must conclude that the ALJ failed to build an accurate and logical bridge.

The Court stresses that this Memorandum and Order should not be construed as an indication that the Court believes that plaintiff was disabled during the relevant period, or that he should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

The Commissioner's final decision denying application for social security disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. § 405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**
**DATE:  August 10, 2017**

                                              s/ J. Phil Gilbert
                                              **J. PHIL GILBERT**
                                              **DISTRICT JUDGE**